Could the attorneys on our first case approach the podium? Lisa, you want to call the case? 16-2540, Maria Brummel v. Richard P. Grossman. Good morning. All right. The attorney for the plaintiff, can you identify yourself for the record? Julie Boynton. Okay. Good morning, Ms. Boynton. How are you today? Great. All right. Attorney for the defense? Good afternoon, two attorneys for the defendants. My name is Michael Corsi. I represent Jason Marks and Noonan Perillo and the firm. Okay. David Riggs. I'm the attorney for Daniel's defendants. Okay. How do you want to split up your time? We'll give you 15 minutes aside and how do you want to? Michael's going to handle it. Okay. Did you want to reserve some time for rebuttal? I just want five minutes. Five minutes. Great. All right. Ms. Boynton, you can proceed. I think they're confusing me. It's my privilege to be representing the Brummel family today. This case was dismissed on statute of limitations grounds. Statute of limitations begins to run when a person knows or reasonably should know of his injury and that was wrongfully caused. Can I ask you a question before you start? Yes. The record did not have the application for adjustment claim in it and I'm wondering was there a worker's compensation case filed or an occupational diseases case filed or both? There wasn't the order and the – No, no. My question is do you know, that's the first thing, whether it was a workman compensation case, an occupational diseases case or both at the industrial commission? I can't say for certainty. Okay. So the answer is you don't know. I don't know. Okay. Proceed. The question of did Brummel know he was injured, the Supreme Court says the standard to be used is that of an ordinary person. I've done legal mail for a long time and I've had a lot of these cases, won some and lost some, but it seems like the courts tend to put a lot of burden on the client who's been injured to have knowledge, which is really beyond their ability to understand. Mr. Brummel knew he had two avenues of recovery. He was bringing a companion case, a workman comp, and whistleblower case, which is also on appeal and we're filing a bribery Monday, and then this case. Mr. Daniels was the overarching attorney who was a very, very close friend of his, had been friends for years, they went to their kids' graduations, events, so he had significant trust in this attorney. Ms. Boynton, is it your position that he doesn't know of his injury or he shouldn't have known of his injury until he talked to the new attorney in 2014? Yes. Okay. So for that position to be correct, are you saying that no affirmative acts or misrepresentations were necessary on the part of the attorneys to extend the statute of limitations? Because we don't even need to get to that because he doesn't know of his injury until 2014? He knew that NICOR was having low settlements for all people, for workman comp. A lot of people were suffering from these toxic work situations and he knew NICOR was playing hardball with those employees. So he was told... Let me ask you this, did somebody force him to take the settlement? He was told by his attorneys it was a good settlement. He was never told by his attorneys what the range of recovery was in the case, so he had nothing to base it off of. Well, doesn't that happen in all personal injury cases? The lawyer handling the case will tell the client that it's a wonderful settlement, but the client knows what his injury is and if it's questionable to him, then shouldn't that client have to inquire a little further? I don't think the client should have to inquire. I think attorneys have an absolute duty to tell the client the risk and the benefits associated with any course of action. That would include explaining to the client, if we go to trial, these are the possible trial results. If you take the settlement, these are the possible settlement results. This is what they're offering. Not only did his attorneys not do that, they told him that's all NICOR is willing to pay. That's what we have to take. It's a good settlement. Take it. We'll get NICOR in the whistleblower case. And it led him to believe this was not going to be his only recovery. Counsel, why did your client go see the lawyer in 2014? Why? Because he lost summary judgment in DuPage County on his whistleblower case. The attorneys there did file a response to a summary judgment motion, and that's what alerted him to the fact. So he came to my office at that time to say, I think something was wrong. I went back. I tried to get the judge to hear it. I got another attorney to come in and try to file a response, and that's when everything was looked at. You were the lawyer in 2014? Yes. So he didn't come to you in 2014 saying, I think that workers' comp occupational disease claim that I filed was bad. He came to you about the other one. Right. He had no idea, and that's when we looked at it and consulted with a workers' comp attorney and determined there was an issue not only with the whistleblower but with the NICOR. Can I go back to the statute of limitations issue once? I don't think I got an answer on this. So the defense is saying 2011, you get a settlement, the statute starts taking right then, right? Correct. Okay. You're saying absolutely not because it only starts taking when you know about the injury and he doesn't know about the injury until 2014, correct? And that it was wrongfully caused. I mean, there's a two-part analysis. It's not just you know of an injury. You have to know it was wrongfully caused. Okay. So is it your position that he doesn't find out about the injury and the causation of the injury until 2014? So is it your position that we don't have to look at any actions the defense attorneys took between 2011 and 2014, any affirmative misrepresentations or anything like that, that would extend your statute of limitations? No, I think you have to look at that because you have to look at the totality of circumstances. He's told us it's a good. . . Okay. So tell me what the affirmative acts or the misrepresentations by the attorneys were in order to extend that statute of limitations. Prior to accepting the settlement, Mr. Daniels and Mr. Marks told Mr. Brummel. . . No, I got that part. What about after 2011? That's right. That's what plays into it. They told him this isn't going to be your only recovery. You know, you're still going to get a recovery from NICOR in the whistleblower's case. And then Mr. Daniels, who's the overarching attorney in both these cases, continues to assure him, don't worry, we're going to get more money from NICOR. So this really falls into kind of like a Jordan Jackson where the attorney is assuring the client, you know, we're going to recover from NICOR. You're going to get your funds. And then it turns out when they get to the adverse appeal, and Jordan Jackson hearing the adverse ruling in the summary judgment, he realizes 125 is the extent of his recovery, that he realizes there's a problem. So would there not be an injury with regard to the settlement if the whistleblower case wasn't dismissed on summary judgment? I guess maybe or maybe not. It would depend on if he got a recovery. So it was all contingent on the whistleblower case whether he had an injury or not? No, it wasn't. He had an injury, but I don't think Mr. Brummel knew he had an injury at that time. I think Mr. Brummel thought this was a partial recovery and he was going to get additional recovery based on what his attorneys told him. Okay. Thanks. But you're talking about negligent advice, malpractice with regard to that first settlement. Correct. And then the continued assurances, we're going to get this money. But the continued assurances weren't, hey, we did a good job with that first claim. You shouldn't feel bad about it. I mean, it was kind of that, but what he was really saying is we're going to get you more. And then that part didn't come true. Well, the continued assurances was at the time he made the settlement and afterwards, this isn't your only recovery. There's still more to be had. You can accept this and, you know, you don't need to worry about accepting this because this is not the totality of your recovery. And then he continued to assure him this isn't the totality, so there's nothing to put him on notice. Do I need to look to see what these poor cop attorneys did was wrong? No. He's continuing with the same attorney, Mr. Daniels, you know, another group in the whistleblower case also. But this is all under one umbrella, and this is what the trusted, this isn't something he picked out of the Internet. This is something he really trusts. He has no reason to question. And I think the issue is was it something that put him, Mr. Bruno, on notice that he should be making inquiry about this NICOR case? No. He's assured this is part of our plan. Well, he did make inquiries, though. He inquired about the other people who were employed at NICOR who got workers' comp settlements, and he asked them what their settlements were. And so he was making inquiries. He just wasn't talking to lawyers. He was talking to other workers. Well, because what he got was consistent with other people. They weren't getting TTD payments. NICOR is taking a long time to settle the plans. NICOR, the employees weren't happy with what NICOR is playing. So he thinks, you know, I'm doing exactly what the other employees are doing. My attorneys tell me this is the best I can do with NICOR. It's a good settlement. He's got no reason to call into question at that point because everything in his universe is pointing to this is the standard, and I'm going to get more in the, you know, there's still additional recovery to come from NICOR. So was that an unusual settlement, what he received? In fact, it was consistent with what all the other workers that he knew about at NICOR were getting. Right, so it didn't put him on notice of, hey, I'm getting next to nothing, and these guys got a lot of money. Something's wrong here. I'd better find out what's wrong. Everybody's not getting much money. Did he know how much money his lawyers demanded from NICOR? He did. He was never told what the range of settlement was, what you could expect. Did you know how much money they asked for? I don't know how much money they asked for. He's writing their record, $150,000. I don't. All I know is when the case came to us, we had it evaluated by a working company who said it was hundreds of thousands of dollars lower than what it should have been. Well, how could they tell you that if they didn't know what the defenses were? Well, we have the documents from the settlement, and it was based on the documents that we had at the time, and we also had additional documents by that time from NICOR and other people. So there had been documents produced in the whistleblower case that were available. The only documents that would mean anything would be the medical reports. Right, and Mr. Brummel's doctor indicated that it was her opinion that the cause of his injury was this toxic work circumstances. I have just one question for you. If we were to write this case the way you are asking us, there is no case law to support that, and what that would mean is that every time a lawyer settles a personal injury case and the client goes to a cocktail party or a bar and meets another lawyer who says that money wasn't good enough, malpractice cases against lawyers would flourish. There would never be a statute of limitations. I don't think that's true. I think the triage case where it says a client, just because they have certain documentation, doesn't mean that the client knows the implications of that. But that's a totally different case than here. Well, it has different facts, but it's still the theory and the law behind it is an average person, a factory worker, a laborer, when they go to an attorney, and I think we tend to forget this as attorneys, they believe what we say. They think we know the law, and they rely on us. And he's believing his attorneys, relying on his attorneys, and just not any attorney but a trusted friend. I don't think this opens the door. I think it's very consistent. I think it's just like Jordan Jackson. When you continue to assure a client of their position and say there's more recovery coming, there's more recovery coming, Well, the more recovery coming argument really is a mitigation argument. It's to mitigate. Well, it might be a defense argument, but it's not in terms of what did the client know and what did the client rely on at the time. The client's relying on this is a good settlement. I haven't had any funds for five years because I didn't get TTD payments. Take this money. Try to support my family and get through, and there will be additional recovery coming. And he's told by the attorneys that that's the case, and they continue to reassure him that's the case. Why would a client, an average person, go in and start questioning at that point? Well, because the amount of settlement ended up being $68 a week for the rest of his life. So wouldn't that cause an average person to question whether that's a sufficient settlement or not? How would he know? If he's never told by his attorney what the possible range of recovery is, how would a lay person evaluate the worth of a work cop case? The average person doesn't know. That's why they go to a specialized person who has particular knowledge to give them that knowledge so they can make an informed decision about whether to settle and so that they can see if it's a good settlement. All he's told by his attorneys, this is a good recovery. This is all NICOR is willing to pay. Take this recovery, and we'll get more recovery from NICOR in the other portion. He saw this as a companion matter, and maybe not all cases would be admirable to this, but in this particular case, I think the facts and the totality of the circumstances show he just had no reason to question his good friend attorney and the advice he was giving him. And I'll save the remainder of my time for rebuttal. Thank you. Thank you. Mr. Corsi. Thank you, Your Honor. May it please the Court. This is, as we've been discussing, a legal malpractice case with a bit of a unique procedural background. We had the plaintiff client who filed an initial complaint making very clear allegations that triggered a very clear motion to dismiss. Mr. Corsi, can I ask you to keep your voice up? These are very important questions. These are not microphones. They're recording devices. So if you could keep your voice up a little, that would be great. Thank you. So it's a peculiar procedural posture in that the client plaintiff of the lawyer in a legal malpractice case files a complaint making very clear allegations, and those allegations gave rise to a motion to dismiss based on the statute of limitations due to the things that were admitted in the complaint at that time. The Court grants the motion but reduces it to a 615 basis for purposes of the plaintiff to then make allegations. Well, because it was lacking in any assertions of what the affirmative acts or misrepresentations were, correct? Correct, Your Honor. So the 615 is giving him another bite at the apple, saying, okay, I'm dismissing your complaint, but try it again with these allegations, correct? Absolutely. And then when they come back, he says, no, all right, I'm going to treat it like a 619 now. Is that correct? In part, Your Honor. Okay. The 615 dismissal, and it's explicit from the record, was for the specific purpose of plaintiffs amending what had previously been identified as paragraph 94 of their complaint to allege what were the assurances. And I asked Judge Callahan, is this post-settlement assurances? Is this pre-settlement assurances? And he said, put it all on the table, all assurances. Would a pre-settlement assurance extend the statute of repose? Of course not. Okay. The amended complaint that then So why would that even be relevant? I think it was an opportunity for the plaintiff to lay out absolutely every single fact that they had to try to allege why it was that Mr. Brummel subjectively did not question the sufficiency of his settlement. That was the opportunity that the trial court gave. Do you think the assurances from the attorneys that he was going to recover on the whistleblower case was in any way a misrepresentation or affirmative act? Well, it can't be as a matter of law because it's a promise of a future event. So under the established case law, what would be a fraudulent statement of fact, an opinion as to a future event cannot be a fraudulent statement of fact. More importantly, in our case, this is But you have to reach a level of fraud. You've got a lawyer who has a fiduciary duty to you. You're trusting them. You're in an environment where you don't know anything about the law. It's kind of like going to the doctor. You put your hands in the doctor's hands, right? You put yourself in your doctor's hands. They tell you things. You say, okay, well, I don't know anything about medicine, so I'm going to believe what you're telling me. When a lawyer says something to you about the future, I think every group probably knows that nobody can guarantee the future, but they're saying in their expert legal opinion that something is likely to happen. That can never be a basis for telling us such limitations? I can't speak to all possible representations that an attorney would make to a client as to a future event. What I can say is in this case, the allegation is that he was told, don't worry, and that there would be more recovery coming down the line. Now, that is absolutely a statement as to a future event with numerous possible variables coming into play with regard to that. But more importantly, it reveals the underlying circumstance of what exactly was occurring between attorney and client at this alleged discussion. Why is the client worrying? Why isn't the client questioning the extent of his recovery where he's looking to see if there will be more later? Both of those reveal, and I don't think that there's any basis in the record to conclude otherwise, that the only inference that can be drawn from that allegation is that the client was indeed worrying about the recovery and was worrying that the recovery was insufficient. That comports exactly with what Mr. Brummel himself personally alleged in his original complaint, that he knew at the time of the settlement that it was unreasonably low. Okay, let's go to that unreasonably low. He talked to all the other NICOR employees who had received a workers' comp settlement, correct? And his was right in line with them. So where is he getting that it's unreasonably low if that's what everybody else was getting? It has to be taken in conjunction with the other allegation that we see for the first time in the amended complaint, was that in addition to discussing the range of the settlement that he was going to be receiving as compared with his coworkers, was that his coworkers also were not receiving temporary total disability towards a common end. And that is alleged explicitly in the complaint. And I'll reference the court. Do you know how you receive temporary total disability? Yes. Do you have any idea? Yes. How? If you show that the injury that put the employee... No, what do you file? What do you do? If it's being declined? What do you do? You file a motion with the arbitrator and have it litigated. So the answer is you don't know. I do know, Your Honor. You have to tell me what you do. You can ask her in this law, by the way. Don't misstep. What do you do? If it's disputed, then you go to a hearing before the arbitrator to prove that the injury keeping the employee... The answer is you don't know. You file a 19B1 petition. And in 10 days, you get a hearing. Ten days. That's what the statute says. So you don't know and she doesn't know. I want to ask you another question. I just want to know whether you know. I just want the truth of the matter. Okay. Was there an application for adjustment to claim under the Workman Compensation Act or under the Occupational Diseases Act? I don't know from the standpoint of the application. Do you have evidence? I do. The settlement agreement in this case checked the box that it was an Occupational Diseases Act. For our purposes, it doesn't really have a lot of significance, but the allegation that was made and checked under the Occupational Diseases Act is significant in that it measures the time for bringing the workers' compensation claim based on the last date of possible exposure of the employee rather than the two years from the date of injury or vice versa, I may be wrong, from the last benefit received. So it was significant in the underlying case that it was checked as an Occupational Diseases Act, but from the standpoint of a settlement, the more significant aspect of that settlement was that Mr. Brummel would be receiving the equivalent of $68 a week, as Justice Burke mentioned, compared against his knowledge that he had been receiving $1,800 a week theretofore. And when you consider it in conjunction against the fact that he had been off work at that period for seven years and had not been receiving anything during those seven years, to put aside questions of medical bills, to put aside the fact that he was alleging that he was completely and totally disabled from work, and further putting aside the fact that an attorney would know he's not getting 100% of past wages and he's not going to get 100% of disability from a wage standpoint, that client at that time is left with no other conclusion but that $125,000 is not compensating him for the time that he's been off work, is not compensating him for all of the medical bills that he's incurred to date, is not compensating him for all of the medical bills that he's going to have in the future as a result of an occupational disease, and is certainly not compensating him for the fact that he's never going to be able to work again. Do you know how much money he would get for TTD per week? It would be 66% of his average weekly wage, subject to whether it exceeded the maximum cap, if I recall correctly. I have now practiced workers' comp in probably six years. I could tell. Counsel, the secondary lawsuit that the lawyer said, don't worry, we'll get more from, it had a retaliatory discharge claim. Correct. What else did it have? Do you know? I don't. I did not study that complaint for purposes of today's argument. I guess my question is, is that a lawsuit that the other workers would not have had? He was comparing himself to other workers. I believe that we all got these settlements that we didn't like from occupational disease or workers' comp. He had another thing in his back pocket, or at least the lawyer allegedly told, your client allegedly told him he did. Did the other workers have that same thing going for them, do you know? I believe there were a couple other whistleblowers. I don't know if they were terminated as well. But the importance of Mr. Brummel's conversations with the other workers is that they recognized that NICOR was engaging in siege litigation as it related to the workers' compensation claims. They were, according to the amended complaint, forcing these employees to go without medical benefits, to go without temporary total disability for the express purpose alleged in the amended complaint of having these workers compromise the settlement values of their cases. That is what is alleged was in Mr. Brummel's mind at the time that he signed the settlement in this case, knowing that he had experienced six years of the same type of siege litigation tactics that all of his other co-workers were complaining about. And so there is no reasonable conclusion but that he should have known, regardless of his protestations before this court through his amended complaint filed by his estate, that he didn't. What I would say is also that the assurances in this case are consistent both pre-settlement and post-settlement. And what we know from the case law is, and that would be Dancor citing the Nolan case, an opinion of legal malpractice or accounting malpractice or any type of professional malpractice from a professional in the field is not required. That would be an unattainable standard consistent with Justice Gordon's question that there would be essentially a worthless statute of limitations because any plaintiff could just sit and wait until he met with a subsequent counsel. That's not what the statute provides here. It's what should a reasonable person have known. We know what a person knew from Mr. Brummel's personal complaint. He knew this was a bad settlement. We know from Mr. Brummel's estate's amended complaint what a reasonable person should have known from the circumstances alleged there, and that's that he should have known. And for that reason... He should have known it was a bad settlement. Correct. Or he should have known that the settlement was the product of bad lawyering. Are those the same thing? They are not. They are not. They are not. The fact that it's a bad settlement, I will agree, is the injury. The question then becomes whether it was wrongfully caused. Right. The other aspect that... So the other clients are getting the same deal as he is, and he's going to say, I must be the only one who has a bad lawyer, or everyone has a bad lawyer. I don't know what the answer to that question would be from the standpoint of the other people as it relates to their attorneys. As it relates to their workers' compensation cases, though, to the extent that they all commiserated that their low settlements were the result of siege tactics by NICOR, then they knew, or should have known, that it was a wrongfully obtained low settlement. And the significance... Bad lawyering. Well, no. That's what we're talking about, right? Bad lawyering. That's what they have to know. That their lawyer screwed up. They don't, Your Honor. And that's this court's Carlson decision. Carlson v. Fish. Okay. So put it in your words. What does wrongfully caused mean in the context of illegal malpractice? Well, in the context of a legal malpractice case, so long as the plaintiff knows that anybody contributed to cause a bad settlement, whether it be the lawyer or whether it be their adversary in the underlying case, that is sufficient to start the clock as to all potential bad actors, be it lawyers or accountants or their business partners, as in Carlson, or be it NICOR, as in this case. There's functionally no difference between this case and Carlson in that respect. The amended complaint shows that there were facts establishing Mr. Brummel had reason to believe that NICOR had caused a wrongfully low settlement. Wrongfully low. That the sole purpose of delaying the wrongful cause was NICOR. I'm saying the amended complaint establishes that. That Mr. Brummel had learned from sources he credited that NICOR was wrongfully lowering the settlement. And that can start the clock on a legal malclaim. Absolutely. That the other side was acting inappropriately. Correct. That's what was established in Carlson, was that his business partners had essentially provided fraudulent numbers. And he settles the case while represented by counsel. The counsel did not participate in the settlement mediation. But he subsequently comes to learn that his partners had submitted fraudulent numbers and brings a claim against those partners. Okay. What this court determined in that case was, at the time you learned that your partners provided you fraudulent numbers and that your settlement was bad, your cause of action arose for that injury because your injury was wrongfully caused. Your cause of action against your business partners for breach of fiduciary duty or whatever may have a five-year or a ten-year or some random number of years depending on which cause of action you bring. But for purposes of the legal malpractice case associated with the attorney's failure to suss out that the partners had fraudulently compiled numbers, that was two years. And those two years had passed at the time that Mr. Carlson filed his action. So regardless of his protests that he didn't know his attorneys had malpracticed, he had admitted through a request to admit that he knew his partners had attempted to defraud him. That starts the one clock that there is. Yeah, but that doesn't sound like this case. Well, it is because he knew that NYCOR had wrongfully caused a lowered settlement. They had delayed it. Well, but aggressive litigation by the other side, we're talking about a legal malpractice case against a lawyer and you're saying that the clock starts to run on a bad settlement regardless of whether he had any reason to think his lawyer screwed up because he could look at the other side and say, boy, they were really aggressive.  So I got a legal mal case against my lawyer. How could that have anything to do with when the clock starts on a legal mal case? It's not a question of aggressive or jerks. It's a question of that was inappropriate to do in the workers' compensation claim. Inappropriate is the standard. I mean, really, I'm not understanding this. How are you taking NYCOR's actions and bringing that into the starting of a statute? Because it's the actions of others measured against your outcome. And if the actions of others are believed to be the cause of an outcome that you perceive to be unfavorable, then those two facts combined means that your clock has run. In other words, even if you should have known that you had no reason to believe that your lawyer did anything wrong at that point. Absolutely. That's what Carlson established. You still start the statute of limitations on the legal mal against that lawyer. You have no reason to believe he did anything wrong. It's just the clock. And the question then becomes, whenever you file whatever case you file, where does that clock stand? If the applicable statute for the claim that you filed was less than where that clock currently stands, then unfortunately, like I am right now, you're out of time. That was really good. Thank you, Mr. Carlson. Ms. Flayton. This is my first time. Mr. Brummel wasn't sitting and waiting after the work comp case stopped. He was continuing on with what he felt was a consolidated action. He viewed these cases together. His attorneys viewed these cases together. They talked to him as if these cases were together. So he's not somebody who sat back and said, you know, I didn't get everything I could have gotten here. Of course, he didn't know what he could have gotten. His attorneys never told him. I think that's just fatal to say that a reasonable person couldn't find that. Or at least there's a genuine issue of fact of whether a reasonable fact finder could find that. He simply did not know that. That wasn't sufficient recovery. And you have to look at the totality of these circumstances. This has to be viewed from the view of an ordinary person, not a sophisticated business person. This is a guy. Everybody around me is getting these kind of recoveries from nine court. My attorney's telling me it's a good recovery. What is putting him on notice that it's not a good recovery? It doesn't compensate him. It's a low amount. I mean, there's no question about it. But his attorneys are telling him it's the best. Isn't there a difference between going back to the lawyer after the settlement and saying, are you sure we got this right? This seems low. I don't like it. And the lawyer saying, yes, this was a good settlement. This is the best we could do. You should be happy. Now go home and stop bothering me. Versus, on the other hand, coming to the lawyer and saying, this is a low settlement. This is enough. And he says, don't worry. There's more coming. That's different than the lawyer saying, that first settlement was fine. Which I don't think you're alleging he was saying. He wasn't saying that's fine. He's just saying, don't worry, more is coming because you happen to have additional claims that are not limited to workers' comp that you can file in court. Didn't work out, it turned out. But aren't those two different things? I don't think so because the attorney's telling him it's a good settlement for the work comp portion of the case. It's a good settlement. That's what the attorneys are telling him. They're not saying, if we took this to hearing, this is the recovery you could get. They're telling him this is good, and he's believing them. And not only are they saying that, but they're saying, and in the companion case, there's more to come. So the client's viewing it in the totality of the circumstances. Okay, they're telling me it's good. I'll take it for this portion. I'll support my family, and we'll get the rest in the work comp cases. That's what my attorney's telling me will happen. You know, when you view it from the ordinary person, I just think there are factual issues that precluded a 2619 dismissal because a reasonable person standing in the shoes of Mr. Brummel would think, I have, this isn't my total recovery. And in the totality of circumstances, he's told that by his attorneys. Not only before, but continuing afterwards. And I think for those reasons that a 2619 dismissal just was not appropriate. Let me ask you just one other thing, Guy. There was nothing in the record on this, and obviously we can't consider this, but this settlement was approved by an arbitrator. Do you know how they approve settlements at the Industrial Commission? You know, Judge, I'm a legal malpractice attorney. We don't get experts in that field because, we don't get experts in every field that we litigate as malpractice attorneys. I know Mr. Johnson, before we closed this practice, brought in somebody, had a review, and they gave him an opinion. Well, do you know whether Mr. Brummel was there when the arbitrator approved it? I would assume he was there. Well, if he was there, the arbitrator would have pointed out to him that he's giving up all of his rights for temporary total disability payments, and how much money he would be entitled to per week, if he proceeded ahead with the case, if he had a case. But his attorneys told him he wasn't eligible for TTP payments. And he believed them. They told him he was not eligible. So he's giving up something he's been told he's not eligible for. But how about the arbitrator, when the arbitrator says, hey, you're giving up all of these rights, doesn't that put somebody on notice that why am I giving up all those rights? I think we're speculating as to what happened. We don't know. Yeah, it could be that maybe this arbitrator was busy and he didn't do his job as best. Yeah. So I really can't answer that because I don't know what was said there. Okay. Sure. Okay. Thank you, Mr. Poitner. Thank you. All right. The case will be taken under advisement, and we'll issue an order as soon as possible. Thank you all. Thank you. Thank you, Mr. Geraghty. Oh, no, it's not. We reached out for you now. We reached out with someone else. Okay.